**FRANK STONER, Plaintiff**

v.

**CHARLES BELLOWS,
DOWNING & BELLOWS CO., LTD.,
Defendants**

Civil No. 38 - 1951.

**FRANK STONER, Plaintiff**

v.

**CHARLES BELLOWS and DORIS BELLOWS,
Defendants**

Civil No. 56 - 1951

District Court of the Virgin Islands

Div. of St. Thomas and St. John at
Charlotte Amalie

April 27, 1951

*Same case on appeal, see p. 583, this volume*

GEORGE H. T. DUDLEY, St. Thomas, Virgin Islands, *for plaintiff*

WARREN H. YOUNG, St. Croix, Virgin Islands, *for defendants*

MOORE, *Judge*

Because of the tremendous pressure of other cases and because of the fact that I already have several cases under advisement, I think it much better to give my opinion from the bench at this time rather than to take this matter under advisement, and then write an opinion at a time when all the evidence and exhibits are not as fresh in my mind as they are at this moment.

This case illustrates the pitfalls open to friends going into business. When two strangers go into business, you usually have each one requiring formal contracts, formal statements, formal deposits, and everything of the kind;

but usually when two friends go into business, and where it becomes one happy family, so many of these things are omitted; and when they do fall out, as happened in this case, there arises bitterness and difficulties which make it the most difficult type of case to try.

Now, here are two people, both of whom pride themselves upon their English background, and wishing to preserve it, for that reason, became friendly and enjoyed each other's friendship and, in the beginning, had the utmost confidence in each other. They went into a business deal without the formalities necessary for such a transaction, and after they got together, they found that they were temperamentally unsuited to each other, and almost immediately recriminations started to arise on both sides.

It is significant in this case that neither side is asking for a cancellation of the contract. The Bellows do not want it, and the Stoners do not want it; but the bitterness which has arisen seems to be a result of a lot of misunderstandings about everything. In effect, these people did not fall out because they disagreed. They fell out and disagreed because they began to dislike each other. Actually, they each started getting stiff about the contract which was never too clear between them and that progressed until they fell out. So that, in reviewing this entire evidence, as well as the exhibits, it seems that one person would stiffen a little and say: "If you don't do a certain thing, I won't do the other"; and each would stiffen a little more until it finally reached an impasse.

█ The Stoners demanded a bill of sale drawn exactly as they wanted it, regardless of what the contract called for, and the Bellows insisted on what they wanted. Prior to that time, when it was all one happy family, it did not make any difference whether they got a bill of sale or whether the inventory was complete or anything else.

175

So, we have a contract here which has to be interpreted in the light of the fact that these people, in that situation, did not define their terms; and, in not defining their terms, we have to take the evidence as presented, coupled with what is the usual practice in business, and consider that these people meant to do that which is usually done in such transactions even though they were friends; except, of course, where it is specifically provided otherwise in their agreement.

A great deal has been made of the false representation and coercion charges against the Bellows, and these false representations and coercions, as I have gleaned both from the argument of counsel and the complaint, are three definite things. First, the Bellows demanded a $1,500.00 deposit before they would do business. I can see nothing in that but one item of good business. As a matter of fact, even our law recognizes it as such. If you go even to a department store and ask them to hold a purchase for you, they require you to give a deposit before they hold it. Even under the Statute of Frauds (1921 Code, Title II, ch. 9, § 1 et seq.; Title III, ch. 91, §§ 2 - 4; 11 V.I.C. § 404; 28 V.I.C. § 241 et seq.), with regard to real estate contracts, such contracts would not be valid unless you make a deposit or give something in writing to bind the bargain.

Second, that the Bellows insisted that they should be assured of the certainty of the purchase and terms of the contract. This court can find nothing of duress or pressure in that. Any person who wants to sell a business wants to know with definiteness whether the purchaser is able and intends to make the purchase before committing himself to wait or hold the deal for him, or he will sell it to someone else. Anyone wanting to sell his business would say to the prospective purchaser, you have to be definite and let me know whether you are going to

buy it or not, because if you do not buy it, perhaps I can get another purchaser. I can see no pressure in regard to merely requiring a person to be definite about whether he is going to purchase or not. Similarly, I can see nothing wrong in requiring him to put up a deposit if he wants to buy.

■ Now, counsel has made the argument that after the Stoners gave up their business in New York City and came to St. Thomas, that the Bellows represented to them that the business being sold was "our business." I cannot say from the evidence what the conversations were that gave the impression that this was "our business," but this much is clear: that at the time the Stoners (and it is significant that the Stoners had made the offer) made the offer to purchase this business, that they had to wait until that offer was confirmed by the corporation, and they knew that this was done by reason of the fact that it came back to them with certain amendments made by the corporation, and they accepted and ratified all of the amendments. So that, before they purchased the business, they had full knowledge of the fact that they were purchasing a business from a corporation and, as such, they knew exactly with whom they were doing business. Even earlier than that, however, the evidence shows that in the negotiations, when the question arose concerning the 4% of gross sales, which I will discuss later, that there was a question as to whose name should be put in; whether the name of the Bellows or the name of the corporation. So that, even if the Bellows referred to it as "our business," because they owned a majority of the stock, and could have the corporation do whatever they wanted, there was no misunderstanding as far as the Stoners were concerned that they were doing business with a corporation known as Downing and Bellows.

■ Counsel has also insisted in his argument, as well

as in his opening statement, that the following mis-representations concerning the business were made: that it was represented that the business was doing or would do gross sales of $60,000.00 a year; that it would yield a gross profit of 25% of that gross sale of $60,000.00, or $15,000.00 with a cost of operation of $4,700.00, or a net profit of $10,000.00, and that this representation was false. The evidence has shown, and it was not contradicted, that during the year prior to this sale to the Stoners, the retail liquor business which the Stoners purchased did a retail business of $61,000.00 as shown by a tabulation of all of the retail sheets. That does not include the Gourmet Shop which was included in this sale and which was estimated at about $12,000.00. So that, if the representation was made that the gross was $60,000.00, it was not a false representation. On top of that, the evidence further shows that during the period from November 7th (less than two months), until the end of December, the Stoners them-selves did something over $9,000.00 worth of gross busi-ness, and that during the three months of 1951, the Stoners themselves have done something over $20,000.00 worth of gross business, so that at the present time, this business has now been in the possession of the Stoners for almost five months and is showing a gross sale at the rate of $60,000.00 a year to them. If the business grossed more than $60,000.00 a year before they bought it, and then grossed at the rate of $60,000.00 for the five months they have had it, that representation of a gross of $60,000.00 cannot possibly be false.

It is alleged further that the Stoners were told that there should be a gross profit of 25% of the gross sales, or a gross profit of $15,000.00 on the gross sales of $60,000.00. The only testimony there is in this case on the question of gross profits in the retail liquor business in St. Thomas is the testimony of Mr. Bellows that from

his experience, both in the United States and the Virgin Islands, that the retail gross profit of retail liquor stores is in excess of 25%, and the testimony of Mr. King, giving a list of the profits here in the Virgin Islands, to be in excess of 25% as is also true in continental United States. Bellows also presented the statement from the United States Chamber of Commerce showing that such average gross profits are 26.3%. As to the firm of Downing and Bellows, the objection was raised that their balance sheet showed during the past year a gross profit of their sales of 18% in one year and 15% in another, and that that represented a gross profit of less than 25%. However, that gross · profit represented the combined gross profits of both the wholesale and the retail departments. It was testified that some of the gross profit of the retail firm was eaten up by the loss of the wholesale firm. There is no evidence in this case denying that, so that it is the finding of this court that the average gross profit of retail liquor stores in St. Thomas, if properly managed, is 25% or more.

It is further alleged that misrepresentation was made as to the net profit in that it was represented to them that a net profit of $10,000.00 could be received out of a gross profit of $15,000.00 by a cost of operation estimated in Exhibit No. 2, and totaling in round figures $4,700.00. It is now claimed by the plaintiffs that $4,700.00 could not possibly represent all of the expenses of the retail business and therefore the net of $10,000.00 could not be a result. However, it is significant that even before the plaintiffs purchased this business, the plaintiffs in their letter to the defendants, set up that same contention and estimated that the expenses of operation would amount to a sum of approximately $5,300.00 in excess of the estimate given by the defendants, and stated that, in their opinion, that represented the correct figure, to

wit: $4,700.00 and $5,300.00 additional, and that the net profits would be cut by that amount which would not be sufficient for "gracious living." Even though the plaintiffs themselves raised this question and had that knowledge and opinion at the time, they still decided and did go through with this purchase, having in mind the main factor that they accepted only the representation that the gross sales would be $60,000.00 and the gross profits 25%, and that they had their own opinion as to what the net profit could be out of that 25%. They decided to purchase the business and run it as a family affair, thus cutting their expenses for help and thus increasing the net profit.

It has been further intimated that the plaintiffs apparently knew nothing about business and that the defendants have more background and experience than the plaintiffs. However, both parties to this law suit are intelligent people who have been in business, and know business principles, understand the English language, are well educated, and knew what they were doing. There is no evidence in this case that anybody is either physically or mentally incompetent, that anyone concerned in this case is under age, and did not have full knowledge of what they were doing as far as the business was concerned. The contract was drawn by the Stoners themselves and submitted to the corporation which accepted it with the four amendments which the Stoners accepted. Therefore, it is the finding and conclusion of this court that no misrepresentations or coercions have been made whatsoever in regard to this business; that both parties went into this contract with an intelligent understanding of what they were doing; with the exception that they did not take the time to express whatever that understanding was in intelligible language.

The contract, as it exists, consists of an offer by

the plaintiffs to purchase this business upon certain terms, plus a counter offer by the defendants to accept those terms with certain amendments, so that in dealing with the contract, we have to consider the contract as being the plaintiffs' offer as modified by the defendants' amendments. That constitutes the contract.

■ Now, the following demands have been made: Plaintiffs have filed suit asking for a modification of the provisions wherein payment on gross sales begins at 4% and is reduced thereafter, to be paid to the defendants. Some witnesses say it is for good will and others say it is for the use of the name "Bellows." It is not clear in the contract just what it is for, except that I have noted very carefully in the contract that it is payable to the corporation and not to the individual "as part of the purchase price." I have also noted from the testimony that the business must have had some good will. No two people would go into a business, especially in St. Thomas, as stiff as the competition is — just walk right into a place and continue doing the same amount of business that had been done heretofore — unless that business had some good will and especially if the gross sales amounted to in excess of $60,000.00.

■ However, it seems to me that the Court need not concern itself as to whether that was payable for good will or for the use of the name. It was agreed to be paid in this contract "as part of the purchase price." I do not think that, in the absence of breach of contract on the part of either party, I have the power to change an agreement which they evolved for themselves. This court can find no reason to modify that agreement, as it was made by the parties themselves, and I can do nothing but carry it out. I have no power to change it, unless I could find some reason for its being abused. This court does not find that there has been any material

breach of contract causing monetary damage on the part of either party; rather, what has occurred has been the kind of stubbornness to go ahead and perform according to the contract, as I have already indicated. It has been a gradual thing in which both sides have participated, one as much as the other.

Now, counsel for the plaintiffs, and the plaintiffs in their complaint, have asked for a bill of sale. There is no question in the Court's mind that they are entitled to a bill of sale and something more than a bill of sale. There is no question in the Court's mind that it was intended that they should obtain the business free and clear of all encumbrances, and should obtain a clear right and title to it.

However, the bill of sale submitted by the plaintiffs is not in accordance with the contract. The bill of sale to which plaintiffs are entitled, is a bill of sale in strict accord with the contract which I have just mentioned, and not a bill of sale which varies the terms of that contract. I said a moment ago that not only were they entitled to the bill of sale, but they are entitled to be free of liability under the Bulk Sales Law of this community (1921 Code, Title II, ch. 32, § 1 et seq.; 11 V.I.C. § 601 et seq.). In the minds of both parties, it was expected that, in buying this business, it should be free of any encumbrance; so that they are entitled by every right to have the sale comply with the Bulk Sales Law in order that they may be free of any liability of the debts of Downing and Bellows Corporation. You gentlemen can work that out in the decree.

The Court finds that they are entitled to be free and clear of all liability of Downing and Bellows, and that a proper bill of sale should be given them, and whatever else is necessary to guarantee freedom from liability under the Bulk Sales Law.

■ The plaintiffs have asked that the defendants be enjoined from engaging in the retail business in the Virgin Islands, and I think that in view of the fact that perhaps there might have been a little evidence that the plaintiffs attempted to deal with wholesale firms and a little evidence that the defendants may have made certain sales which might not have been strictly wholesale, such consideration should be given. Both sides are asking for a similar injunction, and the Court feels that it should grant the injunction to both sides, restraining the one from the retail business in the Virgin Islands and restraining the other from the wholesale business in the Virgin Islands.

Both sides have asked for damages. This court feels that the adjustment of this contract is sufficient and that neither side is entitled to damages.

Now, the defendants have asked that the complaint in Civil No. 38 - 1951 which is the lawsuit that deals with, and is based upon, misrepresentation, be dismissed. In view of what I have said, Civil No. 56 - 1951, the one that deals with misrepresentation and which I have just discussed in regard to misrepresentation, the motion in that case will be granted and the suit will be dismissed.

■ The defendants have asked that the plaintiffs be restricted in the use of the name Stoner and Bellows. I find that it was intended that the plaintiffs should obtain this store free and clear of any liability of the debts of Downing and Bellows. Similarly, I believe it was intended by the Stoners, in purchasing this business, that the defendants should be free of any liability of the debts of the Stoners. I do not believe they had ever become so friendly, when this situation arose, that either one intended to pay the debts and creditors of the other if he became insolvent. So I do not believe, from all of the exhibits, it was ever intended that either the Bellows

or the Downing and Bellows corporation should be liable for the Stoners' debts or, conversely, that the Stoners should be liable for the Bellows and Downing debts.

The very first section of the contract drawn by the Stoners themselves reads as follows: "The Stoners to form a corporation or partnership to purchase for cash certain assets of the retail business of Downing and Bellows Co. Ltd."

That there was no misunderstanding of this by the Stoners is evidenced first by the fact that it was their own language in their offer part of the contract and, secondly, that while in New York arranging their business there to come to the Virgin Islands to take over this business here, Mrs. Stoner stated in her letter to the Bellows (defendants' Exhibit K) as follows with reference to the name and formation of a firm: "I'm practically certain it will be Stoner and Bellows, Ltd., Wine Spirits Merchants" and "Frank will talk to Montgomery on Monday and find out the best way to formulate the Company."

Now, inasmuch as the use of the name of Stoner and Bellows in its present form may cause liability on the part of Bellows, or the corporation of Downing and Bellows, it is the opinion of this court that that name should be no longer used in such a manner as would necessarily cause that liability, and that if the Stoners wish to continue using the name of Bellows, it should be used either as a corporation or under our local law as a limited partnership, or in some other manner or form which will guarantee no liability on the part of either the Bellows personally, or the firm of Downing and Bellows, Inc., as was stated in the contract and clearly intended by the parties thereto. It is the opinion of this court also, from all of the evidence, and from the first paragraph of the contract and from the Stoner letter mentioned before,

that it was intended in the beginning that a firm should be organized and it is only just that it should be carried out, and that if the plaintiffs wish to continue using the name "Stoner and Bellows," it should be either in corporate form or a limited partnership under our laws, so as to relieve the Bellows of any possible liability.

The defendants have further asked for an injunction against wholesale competition. However, as I have just mentioned, that injunction should run both ways. Downing and Bellows should be enjoined from retailing in the Virgin Islands and Stoner and Bellows should be enjoined from wholesaling in the Virgin Islands.

Now, that leaves us but one other question and that is what amounts are due under this contract. It seems to me, and it is undisputed in the evidence, that the balance due under the contract is as follows: $383.75 due upon an open account from the Stoners to the Bellows; $450.00 now due as an installment upon the fixtures and furnitures, a balance of $1,887.41 as a balance due upon the inventory; a balance in an amount of $1,167.64 representing 4% of the gross sales up to date. Therefore, it is the opinion of the Court that the plaintiffs are indebted to the defendants in that amount, which totals $3,888.80 and which amount is now due and owing from the plaintiffs to the defendants under this contract.

The decree may be drawn in conformity with this opinion rendered by the Court.

MR. DUDLEY:

In granting the injunction which will now preclude the plaintiffs from using the name of Stoner and Bellows —

THE COURT:

My opinion is, and the decree may so provide, that plaintiffs may use the name if they use it as a firm name so as not to create a liability on the part of the

Bellows. In other words, they may form a limited partnership or corporation, or any type of firm which will not make the Bellows publicly liable for their debts. The plaintiffs must adopt such form as will afford the Bellows protection and conform to the contract. They may form a partnership to do business under the firm name of "Stoner and Bellows, Ltd.", for instance.

MR. DUDLEY:

I just want to call to the Court's attention that we had pointed out to the Court that my clients had spent $628.36 for the purpose of obtaining stationery, cartons, etc., and the painting of the present billboard with the consent of the defendants following their going into this business. I was wondering whether or not the Court overlooked that.

THE COURT:

I agree with you that I did overlook it. Something should be given them in consideration of that. Let the record show that counsel has called to my attention something I overlooked. It is the opinion of the Court that there is some justification in the matter just mentioned by counsel, and I believe that, in view of it (I asked counsel at the time he was making his argument why was it that nothing was done or no agreements made at the time these things were being printed and made up), there is injury here which should be rectified, and I also believe it would be fair, if plaintiffs spent $630.00 for these items, that the defendants should sustain half of it. Therefore, it would be fair to allow them half of the amount. I will allow the plaintiffs as a set-off against the figures which I have just mentioned, to wit: half of $630.00 or $315.00.

**MR. YOUNG:**

But, your Honor, it would be very easy to have the printer insert the word "Limited" or "Corporation" on their letterheads, envelopes, or bill heads. That would not be too difficult.

**THE COURT:**

No, it would not be easy to have pasteboard whiskey boxes sent back to the printer for additions, and I believe that this set off of $315.00 as I have allowed works equity in the circumstances for, even though it is clear that the Stoners violated the contract in which they agreed to form a corporation or partnership, and also broke their promise in their letter of October 21st in this regard, wherein they promised to form a company to do business under the firm name of "Stoner and Bellows, Ltd.", yet the Bellows, even though they had ample opportunity, did not demand compliance with this part of the contract until after the outlay of $630.00 had been made.

**MR. YOUNG:**

Now, your Honor, please; the defendants having prevailed in this action, are they to be granted costs and attorneys' fees?

**THE COURT:**

No, you may add this to my opinion. It is the opinion of the Court, as I expressed in the beginning, that this action is not an action due to the entire fault of either party. It is an action in which each one stiffened and the other stiffened still a little more, until they got to an impasse. I believe that the action between the parties is a result of that. I do not believe it would be equitable to allow attorneys' fees to either party. It is, therefore, the order of this court that both parties pay their own attorneys' fees.